# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 14, 2011        Decided August 5, 2011

No. 10-1068

JANET GURLEY KATZ,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order
of the Securities & Exchange Commission

*Richard C. Fooshee* argued the cause and filed the briefs for petitioner.

*Benjamin L. Schiffrin*, Senior Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *David M. Becker*, General Counsel, *Michael A. Conley*, Deputy Solicitor, and *John Avery*, Senior Litigation Counsel.

Before: GINSBURG and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  Janet Gurley Katz petitions for review of an order of the Securities and Exchange Commission (SEC) sustaining a disciplinary action against her by the New York Stock Exchange (NYSE).  Because we conclude that the Commission's decision was reasonable and supported by substantial evidence, we deny the petition for review and affirm the SEC order.

I

Katz was a registered representative associated with Wachovia Securities, Inc., a member of the NYSE, at Wachovia's Morristown, New Jersey office.  This case concerns her handling of accounts belonging to seven Wachovia customers:  Paul Pinajian, Harry and Irene Ashbahian, Agnes Voskian, May Kapakjian, Sandra Griffin, and Mary Ann Smith.  With the exception of Mary Ann Smith, Katz's relationship with each of these customers commenced through a referral.  The Ashbahians met Katz through their son, Gregory Ashbahian, who also introduced Katz to his mother-in-law, Agnes Voskian, her daughter, Sandra Griffin, and her sister, May Kapakjian.  Gregory Ashbahian was referred to Katz by Charles Pinajian, who also referred his son, Paul, to her.

The first allegations of Katz's misconduct surfaced in late 2002, when the Ashbahians met with Wachovia branch manager Larry Ennis to complain about Katz's handling of their accounts.  The Ashbahians alleged that money had been removed from their accounts without their authorization, and that signatures on certain documents appeared to be forged.  Ennis referred the matter to Wachovia's compliance department and subsequently placed Katz on administrative leave.  Katz resigned from Wachovia in December 2002.

In August 2006, the NYSE initiated disciplinary proceedings against Katz.[1]  After a sixteen day hearing in which Katz, Ennis, other Wachovia employees, and most of the customers testified, the NYSE found that Katz engaged in conduct that was "inconsistent with just and equitable principles of trade by (i) causing customer funds to be transferred to other customers' accounts without authorization [misappropriation], (ii) making misstatements to a customer, (iii) effecting unsuitable transactions in customers' accounts, and (iv) engaging in unauthorized trading in customers' accounts." *Janet Gurley Katz*, Exchange Act Release No. 61449, 2010 WL 358737, at 2, 20 (Feb. 1, 2010) [hereinafter SEC Op.] (summarizing NYSE findings).[2]  It further found "that she violated NYSE Rule 405 by causing Wachovia to fail to learn essential facts about certain customers," and that she "caused or permitted violations of NYSE Rule 440 and Section 17(a) of the Securities Exchange Act of 1934 and [SEC] Rules 17a-3 and 17a-4 . . . by entering (or causing to be entered) inaccurate information on customers' new account forms."  *Id.* at 2-3

---

[1]The enforcement arm of the NYSE was subsequently consolidated with the National Association of Securities Dealers (NASD) to form the Financial Industry Regulatory Authority, Inc. (FINRA).  Because this proceeding was initiated by the NYSE's enforcement arm, we follow the SEC's convention below and use the designation "NYSE" in this opinion.  *See Janet Gurley Katz*, Exchange Act Release No. 61449, 2010 WL 358737, at 2 n.1 (Feb. 1, 2010).

[2]NYSE Rule 476(a)(6) provides that members and their employees may be disciplined for conduct that is "inconsistent with just and equitable principles of trade."  A violation of another NYSE or Commission rule or regulation also automatically constitutes a violation of Rule 476(a)(6).  SEC Op. at 2 n.2.

4

(citing 15 U.S.C. § 78q(a); 17 C.F.R. §§ 240.17a-3, -4).[3] The NYSE censured Katz and imposed a permanent bar from membership, allied membership, and approved person status, and from employment or association in any capacity with any member or member organization. *See In re Janet Gurley Katz*, at 26 (N.Y.S.E. June 12, 2008) [hereinafter NYSE Op.].

Katz appealed the NYSE's decision to the SEC, *see* 15 U.S.C. § 78s(d), which sustained the majority of the Exchange's determinations, finding that Katz had engaged in securities violations with respect to the accounts of all seven customers.[4] The Commission also sustained the censure and bar imposed by the NYSE. *See* SEC Op. at 20-37.

With respect to Paul Pinajian, the Commission sustained the NYSE's finding that Katz made oral misstatements regarding the balance in his account. At the NYSE hearing, Pinajian testified that his account statements reflected a marked decrease in his balance through 2000, and that, in August of that year, he

---

[3]NYSE Rule 405 requires every member organization to use due diligence to learn the essential facts about every customer. *See* SEC Op. at 3 n.3. NYSE Rule 440 requires brokers and dealers to make and preserve books and records prescribed by the NYSE and by SEC Rules 17a-3 and 17a-4. *See id.* at 3 n.4. And SEC Rules 17a-3 and 17a-4 require brokers and dealers to keep current books and records regarding executed securities transactions and customer accounts. 17 C.F.R. §§ 240.17a-3, -4.

[4]The NYSE found Katz guilty of twenty-seven violations, of which the SEC sustained sixteen. Katz petitions this court for review of fourteen of those, Pet. Br. 9-10, which are the only violations discussed in this opinion.

became aware that Katz was trading his account on margin.[5] According to Pinajian, despite Katz's assurance that she would take his account off margin, in early 2001 his account was still being traded on margin, and his February 2001 statement showed an unexpected decline of almost $100,000. Pinajian testified that he called Katz, who told him that a computer error had caused a margin debit to be deducted twice. His actual balance, she said, was approximately $75,000 higher than his statement indicated. Pinajian testified that, in March, he received another statement showing a steep decline. When he called Katz again, she told him that the computer error had not been corrected, and that he would receive a temporary statement showing the actual balance in his account. For the next several months, Pinajian did receive statements showing higher account balances. But when Pinajian moved his account to another brokerage following Katz's departure from Wachovia, he discovered that the account contained only $36,946.46.

It turned out that the monthly statements showing higher account balances were false. More precisely, they appeared to be altered versions of real statements belonging to a different Katz customer: a label with Pinajian's name and address had been applied to cover the original address. Both Wachovia's operations manager and Katz's assistant testified that Katz had asked the branch receptionist to type up address labels for Pinajian's account.

Katz denied making false statements to Pinajian: in particular, she denied telling him that a margin debit had been deducted twice or that his account statements were incorrect. Although she conceded that the monthly statements sent to Pinajian were false, and that they were altered copies of

---

[5]When investors buy on margin, they borrow cash from the broker, using their other securities as collateral.

statements belonging to another customer, she claimed not to know how they ended up at Pinajian's residence. Katz also disclaimed any knowledge of how Pinajian's genuine statements were diverted to another address, or of how one such statement arrived at the home of a woman who occasionally cleaned her house. In light of the witness testimony and documentary evidence, the SEC concluded that Katz made oral misstatements when she told Pinajian that the decline in his account was due to a computer error.

The SEC also affirmed the NYSE's finding that Katz misappropriated funds from Pinajian's account by transferring them to the account of another customer without authorization. There is no dispute that $8,300 was transferred from Pinajian's account to the account of his uncle, another Katz customer. Pinajian testified that he did not authorize the transfer, never discussed the transfer with Katz, and had no reason to send money to his uncle.

With respect to Harry and Irene Ashbahian, the Commission sustained the NYSE's finding that Katz misappropriated funds from their account by making unauthorized transfers. From March 2001 through October 2002, roughly $30,000 was moved from the Ashbahians' accounts to the accounts of their son and daughter-in-law. Although Katz claimed that she made some of the transfers pursuant to letters of authorization, the Ashbahians denied signing any such documents. Katz also disclaimed knowledge of several of the transfers, noting that she was out of the office for certain periods during 2001 and 2002 dealing with the illnesses and deaths of her step-son and husband, including a time in October 2002 when she traveled to Scotland with her husband, who died during the trip. The SEC rejected Katz's claim that she could not have made the transfers, finding that she

exercised control over her customers' accounts even when she was out of the office.

The SEC also affirmed the finding that Katz engaged in unauthorized trading in the Ashbahians' accounts. The couple testified before the NYSE hearing panel that they were often unaware when Katz made transactions and were "confused or alarmed to discover that Katz had been trading in their accounts." SEC Op. at 30. The Commission agreed with the NYSE that Katz did not have authorization for all of the purchases and sales she made in the Ashbahians' accounts; it made the same determination with respect to the accounts of Agnes Voskian, Sandra Griffin, and Mary Ann Smith.

As for Voskian, the SEC confirmed that -- in addition to making unauthorized trades -- Katz misappropriated funds from her account, engaged in unsuitable trading, and caused books-and-records violations. Regarding the books-and-records violations, the SEC sustained the NYSE's finding that Katz caused Wachovia to fail to learn essential facts about Voskian by entering, or causing to be entered, inaccurate information on Voskian's new account forms. That information included her investment objective, income, net worth, and financial experience.

The SEC also affirmed the NYSE's conclusion that Katz misappropriated funds from Voskian by transferring $13,000 to her son-in-law, Gregory Ashbahian. Like Harry and Irene Ashbahian, Voskian denied signing documents purporting to authorize the transfers. Finally, the Commission agreed with the NYSE that Katz engaged in unsuitable trades on Voskian's account; it made the same finding with respect to Voskian's sister, May Kapakjian. Because Voskian and Kapakjian were both in their eighties, lived on modest retirement incomes, and had invested much of their net worth with Katz, the Commission

found that Katz should not have been trading below-investment-grade securities in the sisters' accounts.

On this petition for review, Katz contests each of the findings described above.[6]

## II

A person aggrieved by a final order of the SEC may obtain review by this court, 15 U.S.C. § 78y(a)(1), but our standard of review is deferential. "The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." *Id.* § 78y(a)(4). And the Commission's "other conclusions may be set aside only if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Graham v. SEC*, 222 F.3d 994, 999-1000 (D.C. Cir. 2000) (quoting 5 U.S.C. § 706(2)(A)).

## A

Katz first contends that we should reverse the finding that she made misstatements to Pinajian because she did not have fair notice of the conduct she would have to defend. Although she concedes that the NYSE's "Charge Memorandum put [her] on notice that she [would have] to defend against the charge of making two oral misrepresentations to Pinajian in the spring of 2001," she argues that the Memorandum did not notify her that she would have to defend against a charge of "creating false monthly statements [or] diverting real monthly statements." Pet. Br. 39. Accordingly, she argues, it was unfair for the NYSE to

---

[6]Katz does not dispute that the sanctions the NYSE imposed and that the SEC upheld were appropriate in light of the violations found. *See* Oral Arg. Recording 4:45.

make, and the SEC to sustain, a finding that she was guilty of the charge of creating false account statements.

But that is not what the NYSE found or the SEC affirmed. As the Commission explained, the "NYSE did not make additional, uncharged findings of violations" regarding the false account statements, but rather "made findings of fact about the monthly account statements, which the NYSE used to support its ultimate legal conclusion that Katz made oral misstatements" to Pinajian "by telling [him] that his account balances were incorrect." SEC Op. at 24-25. In short, the NYSE used the account statements -- which Katz concedes were false -- as evidence to support the charge that Katz's oral statements to Pinajian about his account balances were also false.[7]

Moreover, Katz was fully on notice that the SEC would use the account statements for that evidentiary purpose. The Charge Memorandum referenced the false monthly statements that Pinajian received, *see* NYSE Charge Memorandum at 6-7 (J.A. 342-43), and Katz filed a pretrial motion to strike those references, *see* Mot. to Strike at 8 (J.A. 367). The NYSE hearing officer denied Katz's motion, holding that the "duplicate statements may have created a situation in which the customer was more likely to believe misrepresentations about whether errors had occurred in his account balances." Order on Resp't's Mot. at 3 (J.A. 379). Indeed, Katz concedes that "[t]his ruling

---

[7]On appeal, Katz does not contend that the finding that she created false account statements was unsupported by substantial evidence. *See* Pet. Br. 38-41. As both the NYSE and SEC pointed out, "Katz offered no contrary evidence or plausible explanation for how one of her customers, who happened to be losing large amounts of money through her management of his account, happened to receive statements of another of her customers with a greater amount . . . ." SEC Op. at 25.

made it clear that the false monthly statements would or could be entered into evidence at the hearing." Reply Br. 6. Accordingly, there is nothing to her claim that she lacked notice of the conduct she would have to defend. *See Flying Food Grp. Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) (holding that, in administrative proceedings, notice "is sufficient if the [petitioner] understood the issue and was afforded full opportunity to justify its conduct during the course of the litigation" (internal quotation marks omitted)).

B

Katz also challenges the determination that she misappropriated funds from the Pinajian, Ashbahian, and Voskian accounts by transferring them to other accounts without authorization.

First, she contends that, because she was out of the office for extended periods during 2001 and 2002 dealing with the illnesses and deaths of her step-son and husband, she could not have exerted the control necessary to effectuate the transfers. But the SEC reasonably rejected this argument based on the testimony of Katz's assistant that Katz had "'total control over the accounts'; . . . that, even when out of the office, Katz would call in '[a]t least once a day'"; and that "'nothing was happening without [Katz's] knowledge' with respect to her customers' accounts." SEC Op. at 22 (quoting Hr'g Tr. 1046-51, 1297, 1300-01 (Testimony of Doreen Steup)). Katz maintains that the SEC's affirmation that she had "total control over the accounts" was unsupported by substantial evidence. Although she acknowledges that her assistant testified that she did have such control, she insists that a review of the assistant's testimony indicates that what she meant "was that Katz exercised control over *communications* with her clients." Pet. Br. 42 (emphasis by petitioner). A review of that testimony, however, makes

clear that the assistant's meaning was not limited to client communications.  *See, e.g.*, Hr'g Tr. 1301 (Steup's testimony that "nothing was happening [in Katz's customer accounts] without her knowledge"); *see also* Hr'g Tr. 1046.

Second, Katz argues that the SEC decision was unreasonable because it did not explain exactly what she did to effectuate the misappropriations.  The SEC did not determine, she complains, whether Katz herself moved the funds, directed someone else to do so, or forged documents purporting to authorize the transactions.  But the only issue for the SEC was whether Katz was guilty of misappropriation -- not whether she forged authorization documents or violated other NYSE rules relating to the transfer of funds.  Accordingly, the SEC did not have to determine how Katz moved the money, only that she did so.  And as the Commission rightly recognized, "testimony may be circumstantial in the sense that a witness did not actually see the respondent engaged in the violative conduct," but "can still be persuasive evidence that the respondent engaged in the alleged conduct."  SEC Op. at 24 (internal quotation marks omitted); *see Lucas v. Duncan*, 574 F.3d 772, 777 (D.C. Cir. 2009) (noting that "[w]e generally draw no distinction between the probative value of direct and circumstantial evidence" (quoting *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 343 (D.C. Cir. 2003)).   In this case, circumstantial evidence of misappropriation was provided by the fact that transfers were made, by Katz's admission that she effected certain transfers, by the customers' testimony that they did not authorize the challenged transfers, and by the testimony of Katz's assistant that Katz had total control over the accounts.  Although not overwhelming, this evidence was sufficient to support the inference that both the NYSE and SEC drew.

Third, Katz argues that the SEC decision was unreasonable because the Commission did not explain why it failed to give

weight to several signed letters purportedly providing authority for transfers from the accounts of the Ashbahians and Voskian, as well as other letters from the three customers purportedly indicating that they approved all of the activity in their accounts. But the SEC did explain. As the Commission noted, the NYSE had credited the testimony of Katz's customers, all of whom denied creating and signing the documents upon which Katz relies. The Commission declined to overturn the NYSE's credibility finding, SEC Op. at 21-22, and "this court is least inclined to second guess such [credibility] findings where, as here, the Commission affirmed the [body that] heard the testimony in question," *Zacharias v. SEC*, 569 F.3d 458, 470 (D.C. Cir. 2009).

Finally, Katz maintains that the findings of misappropriation departed from SEC precedent without explanation. According to Katz, the SEC had never before upheld a finding of misappropriation where there was no finding of benefit to the broker and no relationship between the broker and either account. But here, the SEC found both: Katz, the Commission explained, "had a relationship with all of the account holders to and from whom funds were transferred: she was their registered representative. She also derived a personal benefit by keeping the clients who received the transfers happy and retaining their business." SEC Op. at 23. Katz insists that "these are not the kinds of benefits or relationships that have sufficed to sustain findings in the past." Pet. Br. 51. She does not, however, cite any prior case that *limited* the kinds of benefits or relationships that are sufficient to prove misappropriation. Moreover, as the SEC noted, it had previously held, in *Cathy Jean Krause Kirkpatrick*, "that a registered representative had misappropriated $34,000 of a customers account 'for her own purposes' where $31,944 of those funds were used 'to cover losses in the brokerage account

of another customer.'"  SEC Op. at 23 & n.25 (quoting 53 S.E.C. 918, 921, 925 (1998)).

C

Katz next challenges the finding that she caused Wachovia's books and records to be inaccurate, and thereby caused the firm to fail to learn essential facts about Voskian. NYSE Rule 405 requires all member organizations to "[u]se due diligence to learn the essential facts relative to every customer," and a person associated with a member firm can violate that rule by failing to learn specific facts about a customer or failing to fill out a new account form accurately.  *See* SEC Op. at 32 (citing *Dan Adlai Druz*, 52 S.E.C. 416, 422 (1995); *Ivan M. Kobey*, 51 S.E.C. 204, 211 (1992)).  NYSE Rule 440 and Exchange Act Rules 17a-3 and 17a-4 require brokers and dealers to make and preserve books and records, which includes the requirement that those records be accurate.  *See* NYSE Rule 440; 17 C.F.R. §§ 240.17a-3, -4; *see also* 15 U.S.C. § 78q(a). Katz violated those rules, the Commission said, by entering or causing to be entered inaccurate information on Voskian's new account forms.

Katz notes that, although the NYSE found she had entered false information on new account forms for all seven customers, the SEC reversed as to all customers other than Voskian.  She particularly notes that, although May Kapakjian -- like Voskian -- had "Growth & Income (return emphasis)" listed as the investment objective on her new account form, the SEC reversed the finding of a violation with respect to Kapakjian.  "The Voskian findings of violation," she insists, "should be dismissed for the same reason that the Kapakjian charges were."  Pet. Br. 58.

This argument simply does not come to grips with the full force of the evidence regarding the Voskian forms. First, although Voskian's form listed "Growth & Income (return emphasis)" as her investment objective, Voskian testified that she told Katz she was not seeking growth and was instead primarily concerned with preserving capital. SEC Op. at 33. She also wrote a note on her confirmation letter stating that "security of principal is the most important part of my investment plan and I do not want that at risk for any higher yield." *Id.* (quoting Voskian letter). By contrast, the testimony regarding Kapakjian's form was more vague, and the SEC found it "insufficiently detailed to find that Kapakjian's new account form[] w[as] incorrect." *Id.* at 35.

Moreover, the customer's investment objective was not the only inaccuracy the SEC found on Voskian's form. The form also stated that Voskian had twenty years of investing experience, an annual income of between $100,000 and $499,999, and a net worth between $500,000 and $999,999. Voskian, however, testified that all of this information was incorrect: her annual income consisted of only social security and $300 per month in pension payments; her net worth at the time she became Katz's customer was only $175,000; and she had only been managing her own finances for the three years since her husband's death. *See id.* at 33. The NYSE lacked similar evidence regarding any other Katz client. It was therefore not arbitrary for the Commission to dismiss the books-and-records charges regarding those clients' forms while affirming the finding of a violation with respect to the Voskian form.

D

Katz also disputes the finding that she made unsuitable investment recommendations by failing "to tailor her

recommendations to Voskian's and Kapakjian's profiles." SEC Op. at 26. But the finding was well supported. Based on substantial evidence, the Commission found that Voskian and Kapakjian "were not savvy market people," that they "lived on modest retirement incomes," and that their Wachovia "accounts appeared to represent a significant portion of their net worth." *Id.* Nonetheless, "Katz recommended that Voskian and Kapakjian invest in individual securities, some of which were below-investment-grade," which "involved a much higher risk of loss than more conservative, diversified investment choices, such as high-yield or high-income mutual funds." *Id.* Moreover, "Katz's strategy for Voskian's and Kapakjian's accounts generated the highest transaction costs of any of the accounts at issue" due to "short holding periods," and those extra expenses "increased the amount by which their investments had to appreciate before they would realize a net gain." *Id.* at 26-27. In light of these facts, the Commission's conclusion -- that Katz's recommendations "represented risky and costly investment choices given Voskian's and Kapakjian's investment profiles," *id.* at 27 -- was reasonable and supported by substantial evidence.

Katz protests that her testimony, and that of branch manager Larry Ennis, established that Voskian and Kapakjian said they were willing to "tolerate a slight risk of fluctuation in market value in return for a higher level of income." Pet. Br. 61-62. But the SEC did not regard the risk to which Katz exposed them as "slight." And in any event, the Commission correctly noted that, under NYSE rules, a "client's awareness of -- or even desire for -- risk does not relieve a registered representative of the obligation to tailor recommendations to each customer's financial profile." SEC Op. at 28.

Katz argues that "in the past, the SEC has refused to opine on the speculative nature of securities . . . in the absence of

specific information about a security," and suggests that the record in this case "does not include evidence of the characteristics of the individual stocks traded in the accounts." Pet. Br. 63 (internal quotation marks omitted). But it does. The NYSE's expert testified that Katz purchased below-investment-grade securities for both Voskian and Kapakjian and that those securities exposed them to more risk than was suitable. *See* Hr'g Tr. at 1702, 1720 (Testimony of NYSE Expert Mary Calhoun).

E

Finally, Katz challenges the findings that she engaged in unauthorized trading in the accounts of Voskian, Griffin, Smith, and the Ashbahians. Those customers "all testified that Katz executed trades in their accounts without their prior authorization and that they were, at times, confused or alarmed to discover that Katz had been trading in their accounts." SEC Op. at 30. The Ashbahians and Smith "also noted that, when they called to complain, Katz would be dismissive, telling them 'not to worry about it.'" *Id.* Katz testified that she had the authority to effect the trades she made, but the NYSE hearing panel "refused to credit Katz's testimony," and the SEC accepted the NYSE's credibility determination. *Id.*

On this appeal, Katz's only claim is that the NYSE did not give her notice of which specific trades were allegedly unauthorized. As the Commission noted, however, "the NYSE specified that Katz had engaged in unauthorized trades 'in most cases' or 'regularly,'" at least with respect to the Voskian, Griffin, and Ashbahian accounts. *Id.* at 31. Accordingly, it was reasonable for the Commission to conclude that she "was thus aware that the NYSE would challenge most of the trades in her customers' accounts." *Id.* Given the NYSE's specification, as well as the fact that "she had a full opportunity to defend against

this allegation and to cross-examine the witnesses who testified that Katz had effected transactions in their accounts without proper authorization," *id.*, we perceive no error in the proceedings or findings.

III

For the foregoing reasons, the order of the Commission is

*Affirmed*.