# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 13, 2012       Decided April 30, 2013

No. 10-1421

NETCOALITION AND SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

NASDAQ OMX PHLX LLC, ET AL.,
INTERVENORS

———

Consolidated with 10-1422, 11-1001, 11-1065

———

On Petitions for Review of Orders of
the Securities & Exchange Commission

———

*Carter G. Phillips* argued the cause for the petitioners.
*Dennis C. Hensley*, *Kevin J. Campion*, *Eric D. McArthur*,
*Roger D. Blanc*, *John R. Oller*, *Jeffrey B. Korn* and *Norman
P. Ostrove* were on brief.

*Mark R. Pennington*, Assistant General Counsel,
Securities and Exchange Commission, argued the cause for

the respondent. *Michael A. Conley*, Deputy General Counsel, and *Jacob H. Stillman*, Solicitor, were on brief. *Luis de la Torre*, Senior Litigation Counsel, entered an appearance.

*Eugene Scalia* argued the cause for the intervenors. *Amir C. Tayrani*, *Ryan J. Watson* and *Douglas W. Henkin* were on brief.

Before: HENDERSON and ROGERS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:   In 2010, three securities exchanges, NASDAQ, NASDAQ OMX PHLX (PHLX) and NYSE Arca—the intervenors in this case—filed with the Securities Exchange Commission (SEC or Commission) proposed changes to their fee-setting rules for the acquisition of certain proprietary market data.  Two trade associations, NetCoalition and the Securities Industry and Financial Markets Association (collectively the petitioners), requested the Commission to suspend the rules pursuant to its authority under section 19(b)(3)(C) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011), contending that they are unlawful under *NetCoalition v. SEC*, 615 F.3d 525 (D.C. Cir. 2010) (*NetCoalition I*).  When the SEC failed to do so, the petitioners sought review in this Court.  Concluding that the Congress's recent overhaul of the Exchange Act dubbed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (Dodd-Frank Act), ousts us of jurisdiction, we dismiss the petitions.

3

I

In *NetCoalition I*, we reviewed a Commission order approving intervenor NYSE Arca's change to one of its market data fee rules. Concluding that the order was arbitrary and capricious because the Commission's reasoning was deficient, we vacated and remanded it to the Commission for further approval proceedings. *NetCoalition I*, 615 F.3d at 544. But the Congress intervened. Responding to the national financial downturn affecting the securities markets in 2008, the Congress enacted the Dodd-Frank Act. Before that Act, the Exchange Act required the Commission to approve a change in market data fee rules before such change became effective. *See* 15 U.S.C. § 78s(b)(1) (2006). The Commission approved such a change only if, after notice and comment, it found that the "proposed rule change [was] consistent with the requirements of the" Exchange Act. *Id.* § 78s(b)(2). The Dodd-Frank Act, however, abandoned the approval requirement. Changes to rules setting fees for market data now "take effect upon filing with the Commission." 15 U.S.C. § 78s(b)(3)(A) (2006 & Supp. IV 2011). The Commission retains the authority to suspend a rule change "if it appears to the Commission that such action is necessary or appropriate to the public interest, for the protection of investors, or otherwise in furtherance of the purposes of" the Exchange Act. Dodd-Frank Act § 916(c)(2)(A), 124 Stat. at 1835 (codified at 15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011)). A suspension triggers the requirement for notice-and-comment approval proceedings. *Id.* § 916(c)(2)(B), 124 Stat. at 1835 (codified at 15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011)).

After our remand in *NetCoalition I*, the three intervenors filed with the Commission changes to certain rules establishing fees for various market data products. Before

proceeding to the specific rule changes at issue in this case, we briefly lay out the relevant statutory framework.

## A.

As national securities exchanges, the intervenors are self-regulatory organizations (SROs). *See* 15 U.S.C. § 78c(a)(26) (2006) (defining SROs). They therefore "have 'a duty to promulgate and enforce rules governing the conduct of [their] members,' under the oversight of the SEC." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 560 F.3d 118, 119 (2d Cir. 2009) (quoting *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 51 (2d Cir. 1999)); *see also Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 352–53 (1963) (discussing SRO's duty of self-regulation). Exchanges must file their rules with the SEC and ensure compliance therewith. *See* 15 U.S.C. § 78f(b)(1) (2006). Section 6 of the Exchange Act requires that the rules of national securities exchanges, *inter alia*, "provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities"; "promote just and equitable principles of trade"; and do not "permit unfair discrimination between customers, issuers, brokers, or dealers" or "impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of" the Exchange Act. 15 U.S.C. § 78f(b)(4), (5), (8) (2006).

Section 11A imposes additional requirements for rules setting fees for the acquisition of market data. Added to the Exchange Act in 1975, section 11A sets out "to facilitate the establishment of a national market system for securities," Securities Acts Amendments of 1975, Pub. L. 94-29 § 7(a)(2), 89 Stat. 97, 112 (codified at 15 U.S.C. § 78k-1(a)(2) (2006)), and, *inter alia*, "to link securities markets nation-wide in order to distribute market data economically and equally and to promote fair competition among all market participants."

*NetCoalition I*, 615 F.3d at 528. To ensure the wide availability and equitable dissemination of market data, section 11A requires exclusive processors of proprietary market data such as the intervenors, *see* 15 U.S.C. § 78c(a)(22)(B) (2006) (defining exclusive processors), to distribute that data on terms that are "fair and reasonable" and "not unreasonably discriminatory." *Id*. § 78k-1(c)(1)(C), (D) (2006).

Pursuant to its section 11A mandate, *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1094 (D.C. Cir. 1978), the Commission has promulgated a series of regulations ensuring the wide availability and dissemination of market data. It has established two categories of data—core and non-core. *See* Order Setting Aside Action by Delegated Authority and Approving Proposed Rule Change Relating to NYSE Arca Data, Release No. 34-59039, 73 Fed. Reg. 74,770, 74,779 (Dec. 9, 2008) (NYSE Arca Order). Core data, which "form the heart of the national market system," Regulation NMS, Release No. 34-51808, 70 Fed. Reg. 37,496, 37,503 (June 29, 2005) (quotation marks omitted), is reported by the exchanges to data processors, which then consolidate it into a single stream of data for each NMS stock. 17 C.F.R. §§ 242.601–.603. Because the SEC requires exchanges to provide this data, the SEC has determined that fees charged for core data "need to be tied to some type of cost-based standard in order to preclude excessive profits if fees are too high or underfunding or subsidization if fees are too low." Regulation of Market Information Fees and Revenues, Release No. 34-42208, 64 Fed. Reg. 70,613, 70,627 (Dec. 17, 1999).

All other market data falls into the non-core category. The SEC does not require exchanges to provide specific non-core data but instead allows market forces to determine which non-core data are provided. Regulation NMS, 70 Fed. Reg. at

37,567 (The Commission "will allow market forces, rather than regulatory requirements, to determine what, if any, additional quotations . . . are displayed to investors."). The requirements of sections 6 and 11A apply to fees charged for core and non-core data alike. *See* NYSE Arca Order, 73 Fed. Reg. at 74,779.

B.

The petitioners seek review of four changes to SRO rules charging fees for non-core market data products. In No. 10-1421 and No. 11-1065, PHLX filed changes to the rules governing fees imposed for two of its options market data products. Notice of Filing and Immediate Effectiveness of Proposed Rule Change Relating to Fees for the PHOTO Historical Data Product, Release No. 34-63351, 75 Fed. Reg. 73,140, 73,140 (Nov. 29, 2010) (PHOTO Historical Proposal); Notice of Filing and Immediate Effectiveness of Proposed Rule Change by NASDAQ OMX PHLX, Inc. Relating to Market Data Feeds, Release No. 34-62887, 75 Fed. Reg. 57,092, 57,092 (Sept. 17, 2010) (PHOTO Proposal). In No. 10-1422, NASDAQ filed a rule change altering the fee structure for its TotalView market data product. Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Modify Rule 7019, Release No. 34-62907, 75 Fed. Reg. 57,314, 57,314–315 (Sept. 20, 2010) (TotalView Proposal). And in No. 11-1001, NYSE Arca filed a rule change with the SEC on November 1, 2010, pursuant to which it charges fees for its ArcaBook market data product. Notice of Filing and Immediate Effectiveness of Proposed Rule Change by NYSE Arca, Inc. Relating to Fees for NYSE Arca Depth-of-Book Data, Release No. 34-63291, 75 Fed Reg. 70,311, 70,312 (Nov. 17, 2010) (ArcaBook Proposal).

Although the petitioners and the intervenors debate at length the merits of the proposed rules changes, the SEC

declines to take a position on the merits, asserting instead that this court lacks jurisdiction to review the petitions. Its refusal to join the merits issue is well-taken. The SEC conducted no proceeding and created no administrative record documenting its decision-making process or explaining its reasoning. If we have jurisdiction, therefore, well-established norms of judicial review require us to remand the petitions to the Commission to create a record and issue a judicially reviewable order. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *see also Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1324 (D.C. Cir. 1991) (per curiam) ("Where the agency has failed to exercise its expertise or to explain the path that it has taken, we have no choice but to remand for a reasoned explanation . . . ."). We therefore turn to the critical question of jurisdiction.

## II

### A.

Both the SEC and the intervenors contend that we lack authority to review the petitions. First, they argue that the SEC's failure to suspend is not a "final order" under the Exchange Act's direct review provision, 15 U.S.C. § 78y(a)(1). Second, they argue that even if the SEC's failure to suspend is a final order, the Congress precluded our review thereof when it amended section 19(b)(3)(C) of the Exchange Act. Third, they argue that even if we disagree with the foregoing, the Congress has committed the question of when to suspend a proposed rule change exclusively to the Commission's discretion such that the petitions are

nonjusticiable under the APA. *See Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (5 U.S.C. § 701(a)(2) places narrow category of agency action "committed to agency discretion by law" outside scope of judicial review). Finally, the intervenors alone contend that the petitioners failed to raise their objections to the TotalView Proposal before the Commission and we therefore lack jurisdiction to review that petition. *See KPMG, LLP v. SEC*, 289 F.3d 109, 117 (D.C. Cir. 2002) (Exchange Act section 25(c)(1)'s administrative exhaustion requirement is jurisdictional).

The petitioners counter that we have jurisdiction. First, they contend that in this Circuit, agency inaction having the same effect on parties' rights as a final order can constitute a final order. Second, they concede that section 19(b)(3)(C) removes from judicial review an SEC order suspending a rule change but nonetheless argue that the ouster extends only to a suspension order and not to a failure to suspend. Finally, they argue that the suspension decision is mandatory under certain circumstances such that the Congress has not placed the suspension decision solely within the Commission's discretion.

"[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Rhurgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)). Moreover, "[i]n our circuit it is a venerable practice, and one frequently observed, to assume *arguendo* the answer to one question in order to resolve a given case by answering another and equally dispositive one." *Earle v. District of Columbia*, 707 F.3d 299, 304 (D.C. Cir. 2012) (quotation marks and alterations omitted; brackets added). Assuming without deciding that the petitioners correctly characterize the Commission's failure to suspend as

a final order under section 25(a)(1), we nonetheless conclude that amended section 19(b)(3)(C) withdraws our jurisdiction to review such failure. We therefore decline to reach any other justiciability or jurisdictional question presented by these petitions. *See Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) ("[F]ederal courts may choose any ground to deny jurisdiction . . . .), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).

B.

The Administrative Procedure Act (APA) provides the standard of review for agency orders, *see Wonsover v. SEC*, 205 F.3d 408, 412–13 (D.C. Cir. 2000), but it "is not a jurisdiction-conferring statute." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006). Jurisdiction to review an agency action requires " '[t]wo things[:] The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it.' " *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010) (quoting *Mayor v. Cooper*, 73 U.S. (6 Wall.) 247, 252 (1868)) (citation, emphasis and brackets omitted). And unless the Congress has, as here, expressly supplied the courts of appeals with jurisdiction to review agency action directly, an APA challenge falls within the general federal question jurisdiction of the district court and must be brought there ab initio. *Bell v. New Jersey*, 461 U.S. 773, 777 & n.3 (1983); *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481 (D.C. Cir. 1994).

Our constitutional jurisdiction is not in doubt. On behalf of their members, the petitioners assert a financial injury allegedly caused by the SEC's inaction which could be remediated if the SEC were to suspend the fee rules. Article III thus poses no bar to our jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (laying

out three requirements of Article III standing); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (setting out requirements of associational standing); *see also Miss. Valley Gas Co. v. FERC*, 68 F.3d 503, 508 (D.C. Cir. 1995) (Article III standing plain if agency action affects rates petitioner will pay).  The question is whether the Congress has empowered us to review the SEC's inaction.

The Exchange Act contains a direct review provision, to wit: "A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit . . . ." 15 U.S.C. § 78y(a)(1) (2006).  An appellate court's jurisdiction under a direct review statute is strictly limited to the agency action(s) included therein. *See Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir. 2012); *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1287 (D.C. Cir. 2007); *see also Bath County v. Amy*, 80 U.S. (13 Wall.) 244, 247–48 (1871) ("It must be considered as settled that the Circuit Courts of the United States . . . . are creatures of statute, and they have only so much of the judicial power of the United States as the acts of Congress have conferred upon them.").  Accordingly, we have jurisdiction under section 25(a)(1) to review only "final order[s]" of the SEC. *Indep. Broker-Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 143 (D.C. Cir.), *cert. denied*, 404 U.S. 828 (1971).

The jurisdictional question turns on our construction of amended section 19(b)(3)(C).  Although we accord no deference to the executive branch in construing our jurisdiction, *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 478 (D.C. Cir.), *modified on denial of petition for reh'g*, 270 F.3d 957 (D.C. Cir. 2001), we bear in mind the presumption favoring judicial review of agency

action. *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986); *El Paso Natural Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011). Although the Congress is authorized to preclude judicial review of agency action, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984), we assume that the Congress has not done so absent "clear and convincing evidence of a contrary legislative intent." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (quotation marks omitted).

## C.

We begin, as we must, with the text of the statute. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (quotation marks omitted)); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992). Section 19(b)(3)(C), as amended by the Dodd-Frank Act, provides in relevant part:

> At any time within the 60-day period beginning on the date of filing of such a proposed rule change in accordance with the provisions of paragraph (1), the Commission summarily may temporarily suspend the change in the rules of the self-regulatory organization made thereby, if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]. If the Commission takes such action, the Commission shall institute proceedings under paragraph (2)(B) to determine whether the proposed rule should be approved or disapproved. Commission action pursuant to this subparagraph shall not affect the validity or

force of the rule change during the period it was in effect and shall not be reviewable under section [25(a)] nor deemed to be "final agency action" for purposes of [the APA].

15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011). The language makes clear that the Congress has withdrawn our authority under section 25(a)(1) to review "Commission action pursuant to this subparagraph" and the parties agree that "Commission action" includes at least the summary and temporary suspension of a rule change. They disagree, however, on whether "Commission action" also includes the failure to suspend.

The petitioners first argue that, because the SEC's failure to suspend constitutes a "final order" embodying the SEC's conclusion that none of the three conditions meriting suspension is present, failure to suspend *is* reviewable under section 25(a)(1). Second, although they contend that failure to suspend constitutes a final order, they nonetheless argue that it does not constitute "Commission action pursuant to this subparagraph" because the references to "action" in the provision address only a suspension and not a failure to suspend. Deploying the ancient canon *expressio unius est exclusio alterius*, the petitioners argue that section 19(b)(3)(C) prohibits review of a suspension order only and therefore, by negative implication, leaves review of a failure to suspend unaffected.

Assuming *arguendo* that we agree with the first prong of their argument, we reject their construction of "Commission action pursuant to this subparagraph." The two previous references to "action" refer only to suspension because those references are qualified by the adjective "such." "Such" modifies its subject by reference to what has already been said. 17 OXFORD ENGLISH DICTIONARY 101–02 (2d ed. 1989)

("Of the character, degree, or extent described, referred to, or implied in what has been said."). The only action earlier described is "suspend," so "such action" must refer to suspension.

Moreover, the context in which the first two references to "action" appear also confirms that they refer only to suspension. *See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am., Int'l Union*, 523 U.S. 653, 657 (1998) ("It is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.' " (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993))). "[A]ction" first appears in the clause: "the Commission summarily may temporarily suspend the change in the rules . . . if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011). It would strain credulity to read this provision as setting forth anything other than the circumstances under which the Commission may suspend a rule change. Similarly, to read "action" in the clause "[i]f the Commission takes such action, the Commission shall institute proceedings under paragraph (2)(B) to determine whether the proposed rule should be approved or disapproved," *id.*, to refer both to suspension and to failure to suspend would require the SEC to "institute proceedings" for every proposed rule change, confounding the Congress's express intent that a rule become effective "upon filing with the Commission." *Id.* § 78s(b)(3)(A).

The final reference to "action" in the provision does not, however, refer only to suspension. Granted, principles of statutory construction require us to construe "identical words

used in different parts of the same statute . . . to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). But "the natural presumption that identical words used in different parts of the same act are intended to have the same meaning is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (quotation marks and ellipsis omitted). "[A]ction" appearing in the last sentence of the provision, unlike the two earlier instances, is unmodified by "such." It is modified only by the requirement that the action taken by the Commission be "pursuant to" section 19(b)(3)(C). To read "Commission action pursuant to this subparagraph" as applying only to a suspension would be to ignore the Congress's decision to leave "Commission action" otherwise unmodified in the last sentence of the subparagraph. This we cannot do. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and brackets omitted)); *see also Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 823 F.2d 608, 618 (D.C. Cir. 1987); 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.25, at 430–31 (7th ed. 2007). Instead, we assume that the Congress's decision not to modify "Commission action" so as to indicate that the phrase is limited to suspension was intentional and apply the jurisdictional bar of section 19(b)(3)(C) to any Commission decision thereunder. *See U.S. Postal Serv. v. Postal Regulatory Comm'n*, 599 F.3d 705, 709 (D.C. Cir. 2010) (where limitation appearing in one part of a statute is

not present in another, "its absence creates a negative implication—that no limitation was intended").

The petitioners raise two counterarguments. First, they note the provision declares that "Commission action pursuant to this subparagraph *shall not affect the validity or force of the rule change during the period it was in effect*." 15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011) (emphasis added). Because a *failure* to suspend could not affect the validity of a rule change, they argue that "Commission action pursuant to this subparagraph" must refer only to suspension. Construing "Commission action" to include suspension and failure to suspend, they argue, would read the phrase "to mean one thing in the first clause of the sentence and another in the second." Br. of Pet'rs 23. We disagree. The language following "Commission action pursuant to this subparagraph" governs all Commission action. That certain subsequent language may apply only to certain types of actions and not to others does not permit us to imply the very limitation the Congress expressly excluded.

The petitioners next argue that "background principles of administrative law" support the conclusion that "Commission action pursuant to this subparagraph" refers only to suspension. *Id.* at 24. They argue that under the APA finality test, a suspension order under section 19(b)(3)(C) is " 'merely tentative or interlocutory in nature' " and is therefore not final. *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). A failure to suspend, however, represents the Commission's final "statement," as it were, on the permissibility of the rule change and is therefore subject to review. But the petitioners' "background principles," even if correct, do not apply here. "[A] final order need not necessarily be the very last order." *Isbrandtsen Co. v. United States*, 211 F.2d 51, 55 (D.C. Cir.), *cert. denied sub nom. Japan-Atl. & Gulf Conference v. United States*, 347 U.S. 990

(1954). Courts often review agency orders issued pending further proceedings especially where, as here, the agency's action/inaction could not be challenged in any subsequent proceeding.[1] *See, e.g.*, *Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012); *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 589 n.8, 591 (D.C. Cir. 1971); *Envtl. Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970). Moreover, the petitioners' proposed reading of the statute would render the review provisions of section 19(b)(3)(C) a mere superfluity, simply repetitive of the review provisions of section 25(a)(1) and the APA. We cannot adopt such an interpretation. *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of statutory interpretation requires us to construe a statute 'so that no provision is rendered inoperative or superfluous, void or insignificant.'" (quoting *C.F. Commc'ns Corp. v. FCC*, 128 F.3d 735, 739 (D.C. Cir. 1997))).[2]

---

[1] Moreover, if background principles have any relevance, they cut against the petitioners' argument. Although courts review agency inaction, they do so only under limited circumstances. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62–64 (2004) (under APA, agency inaction is subject to judicial review only if it is discrete and agency was mandated to act). A statute authorizing the review of agency inaction while withholding review of agency action would be an odd duck indeed. *Cf. Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 (D.C. Cir. 2007) (petition was "deemed granted" by virtue of agency inaction, which inaction was unreviewable). The Congress could enact such a review scheme but we will not infer such a scheme from this text.

[2] Having determined that non-suspension must also be "Commission action" under section 19(b)(3)(C), we easily conclude that it is likewise action "pursuant to" section 19(b)(3)(C), to the extent it constitutes reviewable agency action at all. The asserted duty to suspend emanates from the statute and so too the conditions

The plain text of section 19(b)(3)(C) is, to us, "clear and convincing evidence" of the Congress's intent to preclude review of a rule change at the filing stage. *Block*, 467 U.S. at 350–51 (quotation marks omitted); *Abbott Labs.*, 387 U.S. at 141 (quotation marks omitted); *cf. Council for Urological Interests v. Sebelius*, 668 F.3d 704, 709 (D.C. Cir. 2011) (Congress may use, *inter alia*, "specific language" to indicate its intent to foreclose review). The language is "not ambiguous in any sense relevant here; and this court simply is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress." *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1441 (D.C. Cir. 1988).

Although the text of section 19(b)(3)(C) is clear, our view is bolstered by the availability of judicial review down the road. Consistent with the presumption of judicial review of agency action, we have long allowed the availability of other avenues of review to affect our assessment of our jurisdiction. *See, e.g.*, *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 380 (D.C. Cir. 2011) (permitting judicial review where "[n]othing in [the statute] actually creates an alternative mechanism for compliance with the law"); *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 550 (D.C. Cir. 1992) (denying judicial review where such denial "will *not* foreclose all judicial review" (emphasis in original)), *cert. denied*, 510 U.S. 825 (1993); *NLRB Union v. FLRA*, 834 F.2d 191, 197 (D.C. Cir. 1987) (permitting judicial review as "the only remaining path to judicial consideration of the substantive

---

allegedly requiring suspension. The conclusion that a rule satisfies the requirements of section 19(b)(3)(C) must therefore also emanate from that statute. Indeed, the petitioners point us to no other supporting authority therefor. A non-suspension decision is thus "Commission action pursuant to" section 19(b)(3)(C) and we lack authority to review it.

validity" of agency regulations). Section 19(b)(3)(C) provides that "[a]ny proposed rule change of a self-regulatory organization which has taken effect [upon filing] may be enforced by such organization to the extent it is not inconsistent with the provisions of this chapter, the rules and regulations thereunder, and applicable Federal and State law." 15 U.S.C. § 78s(b)(3)(C) (2006 & Supp. IV 2011). As the language makes clear, SROs cannot enforce fee rules against their members if those rules are "inconsistent" with the requirements of the Exchange Act, including sections 6 and 11A. The language also suggests that judicial review, if available, is to occur at the enforcement stage.

The SEC maintains that section 19(d) of the Exchange Act provides for review at the enforcement stage. That section authorizes the Commission, "on its own motion, or upon application by any person aggrieved," to review an SRO action that denies any person "access to services offered by" the SRO. 15 U.S.C. § 78s(d)(1), (2) (2006); *see also Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005) (explaining section 19(d) review procedure). Section 19(f), in relevant part, requires the Commission to review an SRO rule challenged under section 19(d) to ensure that it is "consistent with the purposes of this chapter" and does not "impose[]any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." 15 U.S.C. § 78s(f) (2006); *see also Fog Cutter Capital Group Inc. v. SEC*, 474 F.3d 822, 825 (D.C. Cir. 2007) (explaining SEC standard of review under section 19(f)). The Commission contends that the section 19(f) standard is identical to that applied both in *NetCoalition I* and in ordinary approval proceedings under section 19(b)(2)(C). *Compare* 15 U.S.C. § 78s(b)(2) (2006) ("The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the

requirements of this chapter and the rules and regulations thereunder applicable to such organization."), *with* 15 U.S.C. § 78s(b)(2)(C)(i) (Supp. IV 2011) (same). If the standard is not met, the Commission must "by order, set aside the action of the self-regulatory organization and . . . grant such person access to services offered by the self-regulatory organization or member thereof." 15 U.S.C. § 78s(f) (2006).

The Commission contends that, together, sections 19(d) and (f) permit "a party that is aggrieved by the fees at issue [to] challenge them as not consistent with the Exchange Act, including for not being 'fair and reasonable.' " Br. of Resp't 46. In support of its position, it cites *In re Bloomberg, L.P.*, Release No. 34-49076, 2004 WL 67566 (Jan. 14, 2004). In that Commission proceeding, a member of petitioner NetCoalition—Bloomberg, L.P.—challenged an SRO rule change limiting the member's ability to display market data. *Id.* at *2. The Commission agreed with Bloomberg, declaring that the SRO failed to obtain Commission approval for the rule as required by the Exchange Act and ordered that the rule be set aside. *Id.* at *6.

Moreover, a party aggrieved by the Commission's disposition of a section 19(d) petition undoubtedly may obtain judicial review of that disposition in the court of appeals. *Katz v. SEC*, 647 F.3d 1156, 1161 (D.C. Cir. 2011); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 112 (D.C. Cir. 2008). Accordingly, if unreasonable fees constitute a denial of "access to services" under section 19(d), we have authority to review such fees. In light of *In re Bloomberg* and the Commission's brief in this court, we take the Commission at its word, to wit, that it will make the section 19(d) process available to parties seeking review of unreasonable fees charged for market data, thereby opening the gate to our review.

D.

Our analysis speaks of section 19(b)(3)(C)'s preclusion of review as "jurisdictional." The Supreme Court has "tried in recent cases to bring some discipline to the use of [that] term." *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011). The description can be determinative because "a court's subject-matter jurisdiction cannot be expanded to account for the parties' litigation conduct; a claim-processing rule, on the other hand, even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004). "Accordingly, the term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating that authority." *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243 (2010) (quoting *Kontrick*, 540 U.S. at 455)).

We make clear that section 19(b)(3)(C) imposes a *jurisdictional* bar to our review of the Commission's decision not to suspend a proposed rule change. We have long viewed section 25(a)(1) as jurisdictional. *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007); *Kixmiller v. SEC*, 492 F.2d 641, 643 (D.C. Cir. 1974) ("Our authority to directly review Commission action springs solely from Section [25](a) of the Securities Exchange Act of 1934, which confines our jurisdiction to orders issued by the Commission." (quotation marks and alterations omitted)); *see also Bowles v. Russell*, 551 U.S. 205, 210–11 (2007) (emphasizing importance of previous judicial construction in determining whether statute is jurisdictional). Although section 19(b)(3)(C) does not explicitly speak of "jurisdiction," it does so impliedly by placing both suspension and non-suspension outside the grant of jurisdiction contained in section 25(a)(1). We are therefore

confident that section 19(b)(3)(C) "rank[s] . . . as jurisdictional" under the "readily administrable bright line" test announced in *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006).

## III

Finally, and alternatively, the petitioners ask us to construe their petitions for review as petitions for mandamus relief. We have authority under the All Writs Act, 28 U.S.C. § 1651(a), to issue a writ of mandamus "to effectuate or prevent the frustration of orders previously issued." *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1032 (D.C. Cir. 1983). We may do so either to protect our prospective jurisdiction from unreasonable agency delay, *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984), or "to correct any misconception of [our] mandate by a lower court or administrative agency subject to [our] authority," *Office of Consumers' Counsel v. FERC*, 826 F.2d 1136, 1140 (D.C. Cir. 1987) (per curiam). The petitioners ask us to issue a writ because "[t]he Commission's refusal to suspend the rule changes flouts this Court's mandate in *NetCoalition* [*I*]." Br. of Pet'rs 38.

"The remedy of mandamus is reserved for extraordinary circumstances in which the petitioner demonstrates that his right to issuance of the writ is clear and indisputable . . . ." *Byrd v. Reno*, 180 F.3d 298, 302 (D.C. Cir. 1999) (per curiam). The petitioners cannot clear this high hurdle. We held in *NetCoalition I* that there must be evidence that competition will in fact constrain pricing for market data before the Commission approves a fee charged for market data premised on a competitive pricing model. *See NetCoalition I*, 615 F.3d at 543–44. But the Congress has since jettisoned the requirement that the Commission approve the type of rule changes under review in *NetCoalition I* and,

thus, the *NetCoalition I* mandate no longer applies at this stage of the SRO rulemaking process.  That is not to say that we accept the Commission's contention that the holding in *NetCoalition I* is moot.  It remains a controlling statement of the law as to what sections 6 and 11A of the Exchange Act require of SRO fees.  Because the Commission is no longer required to approve an SRO's fee rule before it becomes effective, however, *NetCoalition I* is, to that extent, inoperative.  Mandamus does not lie when our precedent no longer, at least in part, binds.

For the foregoing reasons we dismiss the petitions in docket No. 10-1421, No. 10-1422, No. 11-1001 and No. 11-1065.

*So ordered.*