NATIONAL ASSOCIATION OF SECU-
RITIES DEALERS, INC., Petitioner,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent,

Institutional Networks
Corporation, Intervenor.

No. 85–1012.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 8, 1986.
Decided Sept. 30, 1986.

Francis J. Wilson, with whom Robert E. Aber, Washington, D.C., was on the brief, for petitioner.

Anne E. Chafer, Asst. General Counsel, S.E.C., with whom Daniel L. Goelzer, General Counsel, and Elisse B. Walter, Associate General Counsel, Washington, D.C., were on the brief, for respondent. Paul Gonson, Atty., S.E.C., Washington, D.C., also entered an appearance for respondent.

Daniel T. Brooks, a member of the bar of Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Ronald D. Eastman and Barry S. Spector, Washington, D.C., were on the brief, for intervenor.

Before MIKVA, GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The National Association of Securities Dealers ("NASD") petitions this court for review of orders of the Securities and Exchange Commission ("SEC" or "Commission") rejecting as excessive a fee that NASD proposed to charge for access to certain computerized securities information that it collects. Intervenor Institutional Networks Corp. ("Instinet") is engaged in the business of, among other things, selling computerized securities information collected by NASD. Instinet objected to NASD's proposed fee before the SEC and now asks this court to affirm the SEC's rejection of that fee. Because we conclude that the SEC's action was not arbitrary or capricious and was supported by substantial evidence, we affirm the orders of the Commission.

## I. FACTUAL BACKGROUND

NASD is a national securities association registered with the SEC pursuant to section 15A of the Securities Exchange Act ("Act"), 15 U.S.C. § 78o–3 (1982 & Supp. 1986). NASD has over 6,700 broker-dealer members located throughout the United States. The purpose of the organization is to provide self-regulation of the over-the-counter ("OTC") securities market. To this end, it owns and operates the NASDAQ system, a computerized securities information service.

The NASDAQ system became operational in 1971 and was intended to rationalize the OTC market by providing buyers and sellers of OTC securities with up-to-the-minute information about market conditions. The NASDAQ system collects price quotation information concerning OTC securities from market makers (*i.e.*, broker-dealers who hold themselves out as willing to buy and sell particular securities on a regular basis). This information is processed by the NASDAQ computers and made available to the public in four basic forms.

NASDAQ "Level 1" service provides the best bid and offer for securities listed on the NASDAQ system to over 100,000 subscribers. NASD does not sell this information directly to subscribers. Rather, it supplies the information to vendors such as Instinet, Quotron Systems, Inc., and Bunker Ramo Corporation, who further process it and sell it to subscribers. In addition to charges assessed by the vendors, Level 1 subscribers pay a monthly fee of $8.75 per computer terminal to NASD.

NASDAQ "Level 2" service provides more complete market information than Level 1. Subscribers receive a full listing of all market maker bids and offers for each NASDAQ security. Level 2 service is not available through vendors, but rather is sold directly to subscribers by NASD. There is a "query function" built into the NASDAQ computers that enables Level 2 subscribers to obtain the most current information concerning each OTC security directly from NASD. Subscribers pay $150 per terminal per month for this service. There are approximately 500 Level 2 subscribers.

"Level 3" service is identical to Level 2, except that, in addition to the query function, it has an "update function" that permits market makers to enter new quotations into the NASDAQ system for securities in which they make a market. Like Level 2 service, Level 3 is provided directly by NASD and costs $150 per terminal per month. There are approximately 2,000 Level 3 subscribers.

The fourth form in which NASDAQ information is made available to the public is "NQDS" service. This service provides subscribers with the same information that is available through NASDAQ Level 2 service. Unlike that service, however, NQDS service is not sold directly to subscribers by NASD. Rather, as in the case of Level 1 service, NQDS data is provided in raw form to vendors, who process the data and then sell it to subscribers. At the present

time, Instinet is the only vendor engaged in the business of selling NQDS data to subscribers. This case concerns the fee that NASD may charge NQDS subscribers for the information that they receive through Instinet.

NQDS service is of relatively recent origin. It was initiated as a result of a 1981 SEC decision that required NASD to make available to securities information vendors full price quotation data for those NASDAQ securities designated by NASD as "national market system" ("NMS") securities. Instinet was the only vendor to express an interest in obtaining this data. Instinet and NASD entered negotiations aimed at reaching an agreement similar to that existing between the parties with respect to Level 1 service. Both parties understood, however, that, unlike Level 1 service, Instinet's new service would be in direct competition with NASDAQ Level 2 service.

Negotiations between the parties soon reached a deadlock over the question of fees, and in June 1983 NASD filed its proposed terms with the SEC. Under NASD's proposal, Instinet was to be charged a $3,200 per month "vendor fee," which would cover the cost of transmitting quotation data from NASD to Instinet. In addition, Instinet's customers were to pay NASD a "subscriber fee" based on the $150 per terminal per month fee paid by NASD's Level 2 and Level 3 ("Level 2/3") customers. The $150 fee was to be discounted to reflect the fact that Instinet subscribers would receive quotations for only NMS securities rather than all securities available through Level 2/3 service. The amount of the discount was to be in rough proportion to the percentage of total NASDAQ trading volume not consisting of NMS securities.

## II. SEC PROCEEDINGS

In July 1983, Instinet filed a petition with the SEC pursuant to section 11A(b)(5) of the Act, 15 U.S.C. § 78k–1(b)(5) (1982), alleging that NASD's proposed terms were an inappropriate prohibition or limitation of access to NASDAQ information. In particular, Instinet asserted that NASD's proposed fees were unreasonably high. Instinet also claimed that NASD's refusal to provide quotation information for NASDAQ securities not designated as NMS securities would render its service unmarketable.

In a preliminary ruling in August 1983, the SEC found that NASD's proposed fees constituted a prohibition or limitation of access to services. *See* 48 Fed.Reg. 38,124 (1983). The SEC announced the initiation of a proceeding to determine whether NASD's prohibition or limitation of access violated section 11A(b)(5) of the Act, and partial interim relief was granted to Instinet during the pendency of the proceeding. Specifically, NASD was ordered to begin providing full quotation data for NMS securities to Instinet, and Instinet was directed to pay into escrow an amount equal to the sum of NASD's proposed fees. Instinet began receiving NQDS service under the terms of this order in September 1983.

NASD subsequently offered to provide Instinet with quotation data for all NASDAQ securities, not just NMS securities. NASD insisted, however, that the subscriber fee for complete data should be the full $150 fee that it charges its own customers for Level 2/3 service. Thus, the principal issue in the SEC proceeding was the reasonableness of NASD's proposed fees. In essence, Instinet claimed that, because NASD's situation was analogous to that of a public utility, NASD's fees should be based on the costs incurred by it in collecting NQDS data. NASD argued, on the other hand, that its fees should be based on the value of the service provided to Instinet, which value was defined by the fees charged for its Level 2/3 service.

The SEC announced its findings in an order issued April 17, 1984 ("April order"). *See* 49 Fed.Reg. 17,640 (1984). The Commission agreed with Instinet that NASD's charges must be cost-based. The Commission accordingly approved the $3,200 per month vendor fee, but it ruled that the proposed $150 per month subscriber fee

was inconsistent with section 11A(b)(5) of the Act. The Commission explained that NASD's value-of-service method of computing the subscriber fee effectively would require Instinet's subscribers to pay for services that they do not receive from NASD. In particular, the fee charged by NASD for its Level 2/3 service covers the cost of operating the Level 2/3 query function, which is not included in NQDS service and which Instinet must provide to its subscribers at its own expense. The cost to Instinet of operating its own query function is obviously reflected in the fees that Instinet charges its customers. Thus, if NASD were permitted to charge Instinet's subscribers the full $150 fee, those subscribers would be forced to pay twice for a query function that they only receive once.

In order to avoid this problem, the Commission ruled:

> The NASD, in effect, should recover only those costs it would incur if it operated a pure "pass-through" system—a system that only collected information and passed it on to vendors. The NASD should not recover any costs related to its own competing vendor service.

*Id.* at 17,649. The Commission then determined that the best indication of the cost to NASD of collecting NQDS information is the $8.75 per month fee that NASD charges Level 1 subscribers. The Commission explained that Level 1 service essentially provides customers with a refined form of NQDS data. If anything, it should cost NASD more to provide Level 1 service than NQDS service because assembling Level 1 data requires an additional processing step—the NASDAQ computers must search through NQDS quotation data for all NASDAQ securities in order to determine the best bid and offer for each security.

The Commission accordingly dissolved the escrow arrangement created pursuant to its preliminary ruling and reduced the subscriber fee to $8.75 per month pending submission by NASD of an acceptable cost-based fee proposal. In a separate portion of the April order, the Commission directed NASD to expand NQDS service to include NASDAQ securities not designated as NMS securities.

In June 1984, NASD asked the SEC to reconsider the April order insofar as it prevents NASD from recovering the cost of the Level 2/3 query function from Instinet subscribers. The Commission denied this request in an order issued November 8, 1984 ("November order"). *See* 49 Fed. Reg. 45,282 (1984). NASD thereupon petitioned this court for review of the April and November orders.

NASD also filed a second request with the SEC for reconsideration of the April order which was denied by the Commission on March 8, 1985 ("March order"). *See* 50 Fed.Reg. 10,565 (1985). NASD subsequently filed a motion with this court urging us to include its second request for reconsideration and the March order denying that request in the record of this case. This motion must be denied because the second request and the March order were not in existence at the time of the April and November orders and therefore were not "before the agency" as required by Fed.R. App.P. 16(a). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).[1]

NASD has since filed with the SEC a new proposed NQDS subscriber fee of $79 per terminal per month. This proposal was based on a consultant's study of the NASDAQ system which concluded that the per-subscriber cost to NASD of collecting and processing NQDS information is $79. One

---

1. NASD's motion to supplement the record is also denied insofar as it seeks inclusion of memoranda and briefs filed by the parties in connection with the proceedings leading up to the April and November orders. It is well settled that such documents are not part of the record of agency proceedings unless they contain factual

information considered by the agency in reaching its decision. *See Norris & Hirshberg, Inc. v. SEC,* 163 F.2d 689, 693 (D.C.Cir.1947), *cert. denied,* 333 U.S. 867, 68 S.Ct. 788, 92 L.Ed. 1145 (1948). NASD has not claimed that these memoranda and briefs contain such information.

of the assumptions of this study was that the Level 2/3 query function is essential to collection of NQDS data. The $79 figure accordingly includes the cost of operating the query function. On February 21, 1986, the SEC preliminarily found the $79 proposal to be inconsistent with the April order, and proceedings were instituted to determine whether the proposal should be disapproved. *See* 51 Fed.Reg. 6,957 (1986).

Like the March order, the Commission's ruling on NASD's latest fee proposal is not before us in this appeal. Our review therefore is limited to the Commission's April and November orders.

### III. ANALYSIS

■ The position taken by NASD during the SEC proceedings leading up to the April order was obviously untenable. Had the Commission approved NASD's value-of-service fee proposal, Instinet's subscribers effectively would have been required to pay NASD retail rates for a wholesale service. In order to cover its costs, Instinet would have had to impose additional charges on top of the $150 per month NQDS subscriber fee. As a result, Instinet's service would have been uncompetitive with NASDAQ Level 2 service, which is sold for a flat $150 per month. Under these circumstances, the Commission quite properly concluded in its April order that NASD's proposal constituted an improper prohibition or limitation of access to services under section 11A(b)(5) of the Act.

Apparently recognizing that its original position was unreasonable, NASD now concedes that the NQDS subscriber fee must be cost-based. Indeed, counsel for NASD conceded at oral argument that, in view of NASD's most recent cost-based fee proposal, the Commission's April and November orders should be affirmed insofar as they reject a subscriber fee in excess of $79 per month. Counsel for Instinet and the Commission argued, on the other hand, that the $8.75 per month figure selected by the Commission as an interim fee is a much closer approximation of the actual cost to NASD of providing NQDS service.

The parties being in agreement that the subscriber fee must be cost-based, this case raises the question of whether the SEC's orders allow NASD to recover all costs properly allocable to NQDS service. Our review of the Commission's orders is governed by a very deferential standard. We are required to uphold the orders unless we determine that they rest on factual determinations that are not supported by substantial evidence, 15 U.S.C. § 78y(a)(4) (1982), or that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). Because "[r]atemaking is ... much less a science than an art," and because "[c]ost itself is an inexact standard," this court has held that "great deference is given to [agency] expertise and judgment on the reasonableness of a particular rate proposal...." *Alabama Electric Cooperative, Inc. v. FERC,* 684 F.2d 20, 27 (D.C.Cir.1982). When reviewing ratemaking decisions, "the critical concern of the reviewing court is that the agency provide a coherent and reasonable explanation of its exercise of discretion. If the agency has done so, the decision may not be disturbed even if the court thinks a different decision would have been more reasonable or desirable." *MCI Telecommunications Corp. v. FCC,* 675 F.2d 408, 413 (D.C.Cir. 1982).

We note at the outset that there is no dispute as to many of the costs that NASD seeks to recover. It is not disputed, for example, that the Level 3 update function is essential to NQDS data collection and therefore may be charged to NQDS subscribers on a pro rata basis. Nor is it disputed that NQDS subscribers may be charged for validating new quotations entered into the NASDAQ system by market makers. The principal disagreement centers on the cost of the Level 2/3 query function and the large computer storage capacity necessary to support this function.

NASD advances two basic arguments for allocating query function costs to NQDS subscribers. First, it claims that because the NASDAQ system is highly integrated,

the SEC was not permitted to require NASD to separate out the cost of one element of the system. Second, it claims that because market makers must examine market conditions before updating their quotations for particular securities, the query function is integral to NQDS data collection. For the reasons stated in the sections that follow, we find these arguments unpersuasive and therefore affirm the Commission's orders.

### A. *The Integrated Nature of the NASDAQ System*

NASD's first basic argument is that the SEC improperly disregarded the integrated design and operation of the NASDAQ system in ordering NASD to exclude Level 2/3 query function costs from the NQDS subscriber fee. This argument appears in NASD's brief in a variety of forms, but the underlying theme is the same.

Seizing on the Commission's statement that "NASD, in effect, should recover only those costs it would incur if it operated a pure 'pass-through' system," April order, 49 Fed.Reg. at 17,649, NASD asserts that the Commission erroneously based its orders on "the theoretical costs of a *theoretical* 'pass-through' system" rather than "the real costs of an *actual* system used to provide the securities information." NASD Br. at 27 (emphasis in the original). In a related argument, it claims that the Commission's reliance on "a hypothetical non-existent system supplying no information" contravenes the provisions of section 11A(c)(1)(C), (D) of the Act, 15 U.S.C. § 78k–1(c)(1)(C), (D) (1982), which authorize the Commission to ensure public access to such information "as is" collected or distributed by exclusive securities information processors like NASD. NASD Br. at 46. NASD also argues that the Commission could not properly exclude query function costs in view of a consultant's finding that "the NASDAQ system architecture is monolithic, integrated with respect to functionality, and not susceptible to component analysis of that functionality in a practical sense." *Id.* at 35.

Thus, the essence of NASD's argument is that it cannot be required to separate out query function costs from other NASDAQ system costs because the highly integrated design of the system does not lend itself to such a cost allocation. We must reject this argument, for it is inconsistent with one of the fundamental premises of rate regulation. The problem of allocating costs of common or integrated facilities among different groups of customers is hardly unique to the NASDAQ system; it is presented to some degree in virtually every ratemaking case. That it may be difficult to allocate costs does not provide an excuse for refusing to do so. As one economist has observed:

> The fact that most services are typically provided in combinations, using the same facilities, does not mean that definable shares of the common costs can not in principle be causally attributed to each.... The cost allocation formulae actually employed may achieve only a rough, rule-of-thumb approximation to the actual costs for which each product or service is responsible, but those costs have objective reality.

1 A. Kahn, *The Economics of Regulation: Principles and Institutions* 78 (1970) (footnote omitted).

The Supreme Court has recognized that in allocating costs "[p]recision and exactitude in the mathematical sense are not possible." *Baltimore & Ohio Railroad v. Aberdeen & Rockfish Railroad,* 393 U.S. 87, 92, 89 S.Ct. 280, 283, 21 L.Ed.2d 219 (1968). Even in cases involving highly integrated facilities, cost allocations required by an agency will be upheld if they are not arbitrary and are supported by a reasoned analysis. *MCI Telecommunications Corp. v. FCC,* 675 F.2d at 413. Avoidance of cross-subsidization of services is a legitimate, non-arbitrary reason for requiring difficult cost allocations. *See id.* at 410.

In the instant case, the SEC articulated persuasive reasons for excluding the cost of the Level 2/3 query function from the NQDS subscriber fee. Most importantly, the Commission wished to prevent Insti-

net's subscribers from being forced to subsidize NASDAQ Level 2 service. If permitted such a subsidy, NASD would have been given an unfair competitive edge over Instinet in a market in which NASD already had the advantage of its former monopoly position. We find these reasons sufficient to support the Commission's decision to require NASD to make an admittedly difficult and imprecise cost allocation with respect to the Level 2/3 query function.

When the Commission's orders are viewed in this context, it is clear that they are not based on any sort of "theoretical" model of the NASDAQ system. Nor do they require NASD to distribute anything other than such information "as is" collected by the NASDAQ system. They simply require NASD to allocate the costs of services already provided by the current system. NASD can hardly complain that it is being treated unfairly; similar cost allocations are required in virtually all other regulated industries.

NASD protests that the Commission's exclusion of costs related to the query function will prevent it from recovering the full cost of validating new quotations entered into the NASDAQ system by market makers—a cost that the Commission concedes is integral to NQDS data collection and therefore properly recoverable from NQDS subscribers. NASD seems to believe that because certain NASDAQ computer capabilities—principally computer storage capabilities—support both the validation and query functions, it is prohibited by the SEC's orders from recovering any portion of the cost of these capabilities.

NASD's fears are not well founded. Any blanket exclusion of the cost of shared computer capabilities would violate the principle of functional cost allocation espoused in the April order. That no such blanket exclusion was intended is apparent from the language of the order, which states:

> The Commission believes that validation of the quotation information within specified pre-existing parameters and in the correct format is a proper function of a marketplace, and thus may be considered part of the quotation collection system.... Even if validation is accomplished through comparison with inside quotations, the full storage capacity of all quotations is not necessary to validate quotations. Therefore, *the Commission would expect that only a fraction of storage costs would be properly allocated to NQDS verification.*

April order, 49 Fed.Reg. at 17,649–50 n. 92 (emphasis added). Thus, the Commission clearly intended to permit NASD to recover costs allocable to verification, irrespective of whether the computer capabilities involved also support the Level 2/3 query function. Similar logic would apply to all other capabilities that support both update and query functions: costs properly allocable to the updating of quotations may be recovered. Accordingly, NASD is free to substantiate such costs in any future rate proceeding.

**B.** *Market Maker Use of the Query Function*

NASD's second basic argument is that the SEC erred in ruling that the Level 2/3 query function is not integral to the process of collecting quotations because market makers must use the function before entering new quotations into the NASDAQ system. Market makers cannot update quotations without knowing the bids and offers of other market makers, NASD explains, and the only way for them to obtain this information is through the Level 2/3 query function. This argument was set forth in NASD's first request for reconsideration of the April order, and we think it was properly rejected by the Commission. As stated by the Commission:

> While NASDAQ now may be the primary source for market makers to inquire as to the full quotation stream in a stock, there is no reason why that has to hold true for the future, especially after the NQDS is expanded to cover all NASDAQ securities and other vendors offer services in competition with Level 2.

November order, 49 Fed.Reg. at 45,284.

NASD objects that this conclusion is contradicted by a number of affidavits sub-

mitted by it in connection with its first request for reconsideration of the April order.[2] In these affidavits, market makers state that they currently rely on the NASDAQ query function in updating quotations and that they do not expect to ever rely on a query service provided by competing vendors such as Instinet. NASD asserts that these affidavits were the only evidence in the record concerning the ability of market makers to update quotations in reliance on competing vendor services and that the Commission cited no evidence in support of its conclusion that market makers could rely on such competing services. NASD therefore claims that the Commission's conclusion is unsupported by substantial evidence and must be reversed.

■ We disagree. The Commission was not required to cite record evidence for the self-evident proposition that market makers no longer have to rely on the Level 2/3 query function for current market information now that Instinet's competing service is available. That some, most, or even all market makers do not use the Instinet service does not mean that Instinet subscribers may be forced to subsidize the query service used by those market makers. Market makers now have a choice of query services; those that elect to use NASDAQ service must bear the costs of that service, just as Instinet subscribers must bear the costs of Instinet service. We can discern no error in the Commission's determination on this issue.

## C. *Remaining Contentions*

We have examined NASD's remaining contentions and find them to be devoid of merit. The claim that the SEC should have decided this case in a rulemaking proceeding rather than through adjudication was waived by the failure of NASD to raise the

issue before the Commission. *See* 15 U.S.C. § 78y(c)(1) (1982). We also reject the claim that the Commission applied an improper standard in reviewing the fees NASD proposed to charge for access to NQDS data. NASD argues that the SEC sought to determine whether the fees were "fair and reasonable" rather than "not unreasonably discriminatory," as required by section 11A(c)(1)(D) of the Act, 15 U.S.C. § 78k–1(c)(1)(D). In point of fact, however, the SEC's ruling in this case was made pursuant to section 11A(b)(5)(B) of the Act, 15 U.S.C. § 78k–1(b)(5)(B), which requires it to determine whether the person seeking access has been "discriminated against unfairly"—a standard we find functionally indistinguishable from the one advocated by NASD.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the Commission's determination that NASD may not recover the cost of its Level 2/3 query function from Instinet subscribers was not arbitrary or capricious and was supported by substantial evidence. The Commission's April and November orders are therefore

*Affirmed.*

---

**2.** NASD also claims that the Commission's conclusion is contradicted by a study which found that over 76% of Level 2/3 queries are made by market makers with respect to OTC securities in which they make a market. The findings of this study were only presented to the Commission in connection with NASD's second request for reconsideration and therefore are not part of the record in this case. Even if the findings were properly before us, they would not change our decision, for the fact that market makers frequently use the NASDAQ query function does not refute the Commission's conclusion that market makers can obtain the same information from other sources, such as Instinet.