# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 18, 2020         Decided June 5, 2020

No. 18-1292

THE NASDAQ STOCK MARKET, LLC,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

SECURITIES INDUSTRY AND FINANCIAL MARKETS
ASSOCIATION,
INTERVENOR

———

Consolidated with 18-1293

———

On Petitions for Review of an Order of
the Securities and Exchange Commission

———

*Thomas G. Hungar* argued the cause for petitioner The NASDAQ Stock Market LLC. On the brief were *Eugene Scalia*, *Amir C. Tayrani*, *Jacob T. Spencer*, *Daniel G. Swanson*, and *Stephen D. Susman*.

*Douglas W. Henkin* argued the cause for petitioner NYSE Arca, Inc.  With him on the briefs was *Richard M. Zuckerman*.

*Dominick V. Freda*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Solicitor, and *Benjamin Vetter*, and *Dina B. Mishra*, Senior Counsel.

*Carter G. Phillips* argued the cause for intervenor. With him on the brief were *Michael D. Warden*, *Eric D. McArthur*, and *David J. Feith*.

*Benjamin Beaton* was on the brief for *amici curiae* Bloomberg L.P., et al. in support of respondent and intervenor.

*Hyland Hunt* and *Ruthanne M. Deutsch* were on the brief for *amicus curiae* Investors Exchange LLC in support of respondent and intervenor.

Before: MILLETT and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: For the third time in this long-running dispute, we are asked to consider whether fees that national securities exchanges charge for access to their "depth-of-book" data violate the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. Ten years ago, we upheld the Security and Exchange Commission's "market-based" test for determining whether fees for this type of product are fair and reasonable. *NetCoalition v. S.E.C.,* 615 F.3d 525, 534 (D.C. Cir. 2010) ("*NetCoalition I*"). Three years later, we concluded that a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), deprives us of jurisdiction to review the Commission's decision not to suspend a fee rule within 60 days under Section 19(b)(3)(C) of the Exchange Act.

*NetCoalition v. S.E.C.*, 715 F.3d 342, 343 (D.C. Cir. 2013) ("*NetCoalition II*"). However, we noted in *NetCoalition II* the Commission's position that these fees might be challengeable under Section 19(d) of the Exchange Act, 15 U.S.C. § 78s(d), which allows the Commission to review an exchange's decision to "limit" a person's access to its services. *Id.* at 353. Such a challenge, if proper, would open the door for judicial review. *Id.* ("[A] party aggrieved by the Commission's disposition of a section 19(d) petition undoubtedly may obtain judicial review of that disposition in the court of appeals."). The *NetCoalition II* petitioners then filed a Section 19(d) complaint, and the Commission concluded that Section 19(d) is available as a means of reviewing the reasonableness of the fees. After a hearing, an ALJ found for the exchanges, but the Commission reversed, finding the fees unreasonable. The exchanges have petitioned our Court for review, arguing primarily that the fees at issue here cannot be challenged under Section 19(d).

Today, we hold that Section 19(d) is not available as a means to challenge the reasonableness of generally-applicable fee rules. Section 19(d)'s text does not contemplate challenges to generally-applicable fee rules, and the remedy and notice provisions are incompatible with a challenge to fee rules that do not target specific individuals or entities. Exercising jurisdiction under 15 U.S.C. § 78y(a), we grant the petitions for review, vacate the Commission's decision, and remand for further proceedings.

**I.**

The petitioners in this case—NYSE Arca, Inc. and Nasdaq Stock Market, LLC ("the Exchanges")—are national securities exchanges under the Exchange Act, which governs the major securities markets in the United States. As such, they are quasi-

governmental entities called "self-regulatory organizations," or SROs. *See* 15 U.S.C. § 78c(a)(26). "Although self-regulatory, [SROs] remain[] subject to comprehensive SEC oversight and control." *NetCoalition I*, 615 F.3d at 528. When an SRO wishes to impose or change a fee for its services or products, it must file a rule change with the Commission, 15 U.S.C. § 78s(b), and the Commission must ensure that the rule change is "not designed to permit unfair discrimination between customers, issuers, brokers, or dealers" and does not "impose any [unnecessary] burden on competition," *id.* § 78f(b)(5), (8).

The rule changes at issue here involve fees that the Exchanges charge for their "depth-of-book" data, which "consists of outstanding limit orders to buy stock at prices lower than, or to sell stocks at prices higher than, the best prices on each exchange." *NetCoalition I*, 615 F.3d at 529-30. This data "allows a trader to gain background information about the 'liquidity' of a security on a particular exchange, *i.e.*, the degree to which his total sale or purchase price will differ from what he would receive if the entire trade were made at the prevailing best prices." *Id.* at 530. Two industry groups – the Respondent-Intervenor in this case, Securities Industry and Financial Markets Association (SIFMA), and a now-disbanded group called NetCoalition – challenged the Exchanges' fees, but the Commission upheld them as fair and reasonable under the Exchange Act using a "market-based" approach. *Id.* at 532. The industry groups sought review, and in *NetCoalition I* we upheld the Commission's "market-based" approach for assessing the fairness and reasonableness of fees, but remanded because the record lacked sufficient support for the Commission's conclusion that market forces actually constrained the Exchanges' pricing. *Id.* at 539-44.

While *NetCoalition I* was pending, Congress passed the Dodd-Frank Act, which overhauled the process for the filing

and approval of SRO rule changes. Before the Dodd-Frank Act, "the Exchange Act required the Commission to approve a change in market data fee rules before such change became effective," and the Commission could approve "such a change only if, after notice and comment, it found that the 'proposed rule change [was] consistent with the requirements of the' Exchange Act." *NetCoalition II*, 715 F.3d at 344 (alteration in original) (quoting 15 U.S.C. § 78s(b)(2) (2006)). The Dodd-Frank Act altered this scheme, however, providing that such a rule change "take[s] effect upon filing with the Commission" and "may be enforced by [the SRO] to the extent it is not inconsistent with" the Exchange Act and its applicable regulations. 15 U.S.C. § 78s(b)(3)(A), (C). Under Section 19(b)(3)(C), the Commission may suspend the rule within 60 days of its filing if it concludes that "such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the" Exchange Act. *Id.* § 78s(b)(3)(C). But the statute provides that "Commission action pursuant to [Section 19(b)(3)(C)] . . . shall not be reviewable." *Id.*

After we decided *NetCoalition I*, the Exchanges filed new rule changes to the fee structure for their depth-of-book data products, and the Commission rejected SIFMA's and NetCoalition's request to suspend the rules. *NetCoalition II*, 715 F.3d at 344. SIFMA and NetCoalition then petitioned our Court for review, but we dismissed their petitions in *NetCoalition II*, concluding that we lack jurisdiction over the Commission's decision not to suspend a rule change. *Id.* at 344, 354. Specifically, we held that the Commission's decision *not* to suspend a rule change qualifies as unreviewable "Commission action" under Section 19(b)(3)(C). *Id.* at 347-52.

Relevant here, we noted that our holding was "bolstered by the availability of judicial review down the road," pointing to the Commission's position that aggrieved parties could challenge the fee rules before the Commission at the "enforcement stage" under Section 19(d). *Id.* at 352. Section 19(d) allows aggrieved parties to challenge an SRO action that, among other things, "prohibits or limits [them] in respect to access to services offered by" the SRO. 15 U.S.C. § 78s(d)(1). Without deciding the applicability of Section 19(d), we "t[ook] the Commission at its word, to wit, that it w[ould] make the section 19(d) process available to parties seeking review of unreasonable fees charged for market data, thereby opening the gate to our review," and explained that "*if* unreasonable fees constitute a denial of 'access to services' under section 19(d), we have authority to review such fees." *Id.* at 353 (emphasis added).

Predictably, SIFMA then challenged the fees under Section 19(d). The Exchanges sought dismissal of the challenges, arguing that generally-applicable fee filings cannot constitute "prohibit[ions] or limit[ations]" on access under Section 19(d), because that provision is limited to review of actions targeting specific members. The Commission rejected that argument and referred the matter to an ALJ to decide whether the Exchanges' fee rules constitute a "limit" on access to their services within the meaning of Section 19(d). After a five-day hearing, the ALJ ruled for the Exchanges, concluding that the pricing for depth-of-book data is subject to significant competitive forces. SIFMA sought review, and the Commission reversed the ALJ's decision. The Exchanges have timely petitioned for review from our Court.

**II.**

The first issue presented is the only one we decide today: whether the Commission erred in concluding that a generally-applicable fee rule may be challenged as a "limit[ation]" on "access to services" under Section 19(d) of the Exchange Act.[1] In order to answer that question, we must first determine what standard of review to apply.

When reviewing an agency's construction of a statute it administers, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If the agency's interpretation is reasonable, we usually defer to it. *See id.* But a "reasonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "A statutory provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme[,] because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id.* (internal quotation marks omitted). Therefore, an "agency interpretation that is 'inconsistent with the design and

---

[1] Because we conclude that Section 19(d) is not an available means to challenge the fees at issue here, we do not pass on any of the other issues presented in the briefs.

structure of the statute as a whole' . . . does not merit deference." *Id.* (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) (alterations omitted)).

There is no dispute that Section 19(d) is "silent" about whether charging a fee qualifies as a "limit[ation]" on "access to services." *See Chevron*, 467 U.S. at 843. But the Exchanges argue that the *Chevron* framework does not apply, because other agencies also interpret this provision. Indeed, we have held that "[w]hen a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference," *Proffitt v. F.D.I.C.*, 200 F.3d 855, 860 (D.C. Cir. 2000), and it is undisputed that the Comptroller of the Currency, the Board of Governors of the Federal Reserve, and the Federal Deposit Insurance Corporation also administer Section 19(d), *see* 15 U.S.C. § 78c(a)(26), (34)(B). The Commission does not respond to this argument. Nonetheless, we need not resolve whether *Chevron* applies here, because even assuming it does, the Commission's interpretation of Section 19(d) is unreasonable, and accordingly cannot be sustained.

We note at the outset that *NetCoalition II* does not dictate our Section 19(d) determination. Our discussion of Section 19(d) in *NetCoalition II* is dicta, because our conclusion that the Commission's nonsuspension of fees was unreviewable did not turn on the availability of a Section 19(d) challenge down the road. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("[I]t is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *Gersman v. Grp. Health Ass'n, Inc.*, 975 F.2d 886, 897 (D.C. Cir. 1992) (analysis that "is not determinative of the result . . . must be deemed not a holding"). Instead, we declared that "the text of section 19(b)(3)(C) is clear" that we lack jurisdiction to review the nonsuspension of fees. 715 F.3d

at 352; *see also id.* at 353 ("*If* unreasonable fees constitute a denial of 'access to services' under section 19(d), we have authority to review such fees." (quoting § 78s(d)(1))) (emphasis added). Still, the Commission argues that, whether dicta or not, "it is difficult to perceive how the Commission acted arbitrarily or capriciously in following the path this Court invited it to take." SEC's Resp. Br. at 37. This gets things backwards, as it was the *Commission* who proposed Section 19(d) as a potential avenue of relief. Because the lawfulness of allowing challenges to fee rules under Section 19(d) was not a question before us, we had no occasion to decide it.

With the question now squarely before us, we turn to the relevant text.

First, Section 19(d)(1) reads:

> If any [SRO] imposes any final disciplinary sanction on any member thereof or participant therein, denies membership or participation to any applicant, or prohibits or limits any person in respect to access to services offered by such organization or member thereof or if any [SRO] . . . imposes any final disciplinary sanction on any person associated with a member or bars any person from becoming associated with a member, the [SRO] shall promptly file notice thereof with the appropriate regulatory agency for the [SRO] and (if other than the appropriate regulatory agency for the [SRO]) the appropriate regulatory agency for such member, participant, applicant, or other person. The notice shall be in such form and contain such information as the appropriate regulatory agency for the [SRO], by rule, may

prescribe as necessary or appropriate in furtherance of the purposes of this chapter.

15 U.S.C. § 78s(d)(1).

Second, Section 19(d)(2) allows for Commission review of an exchange's action under Section 19(d)(1):

> Any action with respect to which a[n] [SRO] is required by [Section 19(d)(1)] of this subsection to file notice shall be subject to review by the appropriate regulatory agency for such member, participant, applicant, or other person, on its own motion, or upon application by any person aggrieved thereby filed within thirty days after the date such notice was filed with such appropriate regulatory agency and received by such aggrieved person, or within such longer period as such appropriate regulatory agency may determine.

*Id.* § 78s(d)(2).

The Respondents' theory of review goes something like this: The Exchanges' fee rules are a "limit[ation]" on SIFMA's "access to services," *id.* § 78s(d)(1), and SIFMA is an "aggrieved person" that can seek review of the rule changes before the Commission, *id.* § 78s(d)(2). The Respondents provide no examples (other than this case, of course) of the Commission ever having allowed a challenge to generally-applicable fee rules to proceed under this theory, but they argue that the Commission's interpretation is a permissible one. The Exchanges, meanwhile, maintain that Section 19(d)'s text and structure make clear that it governs only an SRO's "quasi-adjudicatory" proceedings "directed at a specific person or

entity." NYSE Arca's Opening Br. at 27. The Exchanges are closer to the mark.

It is conceivable that a fee may act as a "limit" on access to services under Section 19(d). But not every fee is, by mere virtue of being a fee, challengeable as a "limit" on access to exchange services under Section 19(d). Rather, we hold that for a fee rule to be challengeable under Section 19(d), it must, at a minimum, be targeted at specific individuals or entities. We reach this conclusion for several reasons.

First and foremost, the text of Section 19(d) does not evince an intent by Congress to allow challenges to generally-applicable fee rules.

Indeed, Section 19(d) makes no mention of fees at all. Unlike Section 19(b), which governs the effectiveness of rule filings and expressly references the "changing [of] a due, fee, or other charge," 15 U.S.C. § 78s(b)(3)(A), Section 19(d) does not mention fees, *see id.* § 78s(d). And "[w]here Congress includes particular language in one section of a statute but omits it in another[,] it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (cleaned up).

Even assuming, however, that some fees are challengeable under Section 19(d), the text indicates that they must at least be targeted at specific people. The Respondents maintain that *any* fee rule, even a universally applicable one, is challengeable under Section 19(d) as a limitation on services. *See* SEC's Resp. Br. at 29-30 (arguing that the term "limits" on "access to services" includes fees, because "[i]n common parlance, placing conditions—such as costs, fees, or prices—upon a person's access to something is said to limit that access," and

that "[c]harging fees 'curtail[s] or reduce[s] in quantity or extent' access to the fee-based services" (some alterations in original) (quoting WEBSTER'S NEW COLLEGIATE DICTIONARY 667 (1977))); SIFMA's Resp. Br. at 21 ("The Exchanges never explain why Congress would be less concerned with SRO action limiting access for an entire group than with action limiting it for a specific party."). We think the text says otherwise.

Section 19(d) speaks to "limits [on] any *person*" with regard to accessing the SRO's services. *See* 15 U.S.C. § 78s(d)(1) (emphasis added). Moreover, a generally-applicable fee rule does not resemble any of the specific actions enumerated in Section 19(d), which all involve measures directed at specific individuals or entities. *See id.* (allowing challenges to "any final disciplinary sanction on any member thereof or participant therein" or on "any person associated with a member"; the "deni[al of] membership or participation to any applicant"; or the "bar[ring of] any person from becoming associated with a member"). Under the principle of *ejusdem generis*, "where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980). Here, the term "limits" is a "general word[]" that "follow[s] an enumeration of specific" actions, and should thus be "read as applying only to other [actions] akin to those specifically enumerated." *See id.*; *cf. United States v. Williams*, 553 U.S. 285, 294 (2008) (under the canon of *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated").

The Commission's counterarguments are not persuasive. The Commission contends that the term "limits" would have no substantive meaning if market-data fees were not included.

*See* SEC's Resp. Br. at 30 (arguing that excluding generally-applicable fees from the purview of Section 19(d) would treat "limits" as coextensive with "prohibits" and thus render the term "limits" surplusage).  But courts have interpreted this term to apply outside the context of fees, such as to an SRO's decision to cut off phone service.  *See, e.g.*, *MFS Sec. Corp. v. New York Stock Exch., Inc.*, 277 F.3d 613, 620 (2d Cir. 2002) ("The NYSE's revocation of MFS's membership and its actions to cut off phone service manifestly limited MFS's access to services.").  In other words, an SRO can, without imposing fees, "limit" a customer's access to its services in such a way that isn't a complete "prohibit[ion]" on access.  *See* 15 U.S.C. § 78s(d).

The Commission also relies on *National Ass'n of Securities Dealers, Inc. v. S.E.C.*, where we held that "the Commission [had] quite properly concluded" that a securities information processor's challenged fee proposal "constituted an improper prohibition or limitation of access to services" under Section 11A(b)(5).  801 F.2d 1415, 1419 (D.C. Cir. 1986) (interpreting 15 U.S.C. § 78k-1(b)(5)).  While the Commission is correct that Section 11A(b)(5) employs language similar to Section 19(d)'s, *compare* § 78k-1(b)(5), *with* § 78s(d), the Commission's jurisdiction was not at issue in that case, *see Sec. Dealers*, 801 F.2d at 1416-22.  Moreover, *Securities Dealers* involved an SRO's decision to impose a fee after one-on-one negotiations with the only subscriber that would have paid the fee, and there was a particularized showing that it made no economic sense for *that vendor* to pay the fee.  *See id.* at 1417, 1419-21.  Thus, *Securities Dealers* is consistent with our holding here.

Looking beyond the text, the structure of the Exchange Act renders the Commission's interpretation unreasonable.  *See Util. Air Regulatory Grp.*, 573 U.S. at 321.

For one thing, an exchange's notice obligations under Section 19(d) would be unworkable with regard to generally-applicable fee rules. Section 6(d) requires that, in advance of any "limit[ation]" on "access to services," the exchange must "notify such person of, and give him an opportunity to be heard upon, the specific grounds for denial, bar, or prohibition or limitation *under consideration*[.]" 15 U.S.C. § 78f(d)(2) (emphasis added). And, under Section 19(b), unless the Commission takes action within the prescribed time limits, a proposed rule change "shall take effect upon filing," *id.* § 78s(b)(3)(A), and "may be enforced by [the SRO] to the extent it is not inconsistent with" the Exchange Act, *id.* § 78s(b)(3)(C). If we construed the statute to mean that every generally-applicable fee rule could be a "limit[ation]" on "access to services," an exchange would be required to provide notice to every person to whom the fee could conceivably apply, potentially including those who have not previously purchased but might be considering the depth-of-book products affected. *See id.* Providing such individual notice seems nonsensical and likely impossible.

The Commission insists that the Exchanges could satisfy their Section 19(d) notice obligations merely by complying with the filing requirements in Section 19(b)(3)(A), 15 U.S.C. § 78s(b)(3)(A), because "parties receive notice of the content and basis of immediately effective fee rules when they are filed under Section 19(b)." SEC's Resp. Br. at 35. Not so.

It goes without saying that an immediately-effective fee change cannot plausibly be "under consideration," *see* 15 U.S.C. § 78f(d)(2), and publication of the notice in the Federal Register and on the Commission's website cannot provide an "opportunity to be heard" on an already-enforceable fee, *see id*. The Exchanges are thus correct that, to comply with its notice

obligations under Section 19(d), an exchange considering a generally-applicable fee rule would need to "contact customers that it believe[s] might not be able to afford a product to inform them that their access to the product would be limited" before filing the fee rule and explain to them the "specific grounds" for that limitation. Nasdaq's Opening Br. at 29. We agree that Section 19(d) cannot be reasonably read as requiring exchanges to undertake such action prior to filing a generally-applicable fee rule.

In addition to unworkable notice obligations, reading Section 19(d) to allow challenges to generally-applicable fee rules would be incompatible with the statutory remedy.

Under Section 19(f), if the Commission concludes that an SRO's Section 19(d) limitation violates the Exchange Act, the Commission must provide a two-part remedy. First, it must "set aside the action" of the SRO. 15 U.S.C. § 78s(f). Second, it must "grant [the aggrieved] person access to [the SRO's] services." *Id.* This second part is where the Commission runs into trouble. The Commission is evaluating a general fee increase here. Short of providing free access to depth-of-book data, which none of the parties contend is an appropriate remedy, the Commission cannot "grant access" to all individuals affected by the fee increase. That is so because the Commission required no evidence that the fee increase actually limited any entities' access to the Exchanges' services. Indeed, in its order reversing the ALJ's merits decision, the Commission "set aside" the fees at issue, J.A.78, but stopped short of "grant[ing] . . . access" to the services covered by the fees at the old price, probably because doing so is outside the scope of Section 19(f), 15 U.S.C. § 78s(f). As Nasdaq correctly explains, "[t]his disposition evidently means" that the Exchanges must "give the[ir] product[s] away without charging distributor or direct access fees, submit a new

proposed fee (inevitably inviting another denial-of-access application from SIFMA), or cease offering [the products] altogether." Nadsaq's Opening Br. at 31.

In short, based on the text and structure of the Exchange Act, we conclude that Section 19(d) is not available as a means to challenge generally-applicable fee rules. The text contemplates action targeted at individuals. And under the Respondents' reading, SROs would be required to undertake onerous Section 6 proceedings, with the specter of further proceedings under Section 19(d) in order to implement a generally-applicable change in fees. We think that such a scheme would be at odds with the Dodd-Frank Act's objective of "[s]treamlining" the filing procedures. *See* S. REP. NO. 111-176, at 106 (2010).

Before concluding, we note that our decision today is consistent with the presumption favoring judicial review of agency action. *See NetCoalition II*, 715 F.3d at 352. SIFMA argues that "if review [of market-data fees] were unavailable under Section 19(d), the Commission could insulate [them] from *any* judicial review simply through inaction." SIFMA's Resp. Br. at 19-20. But this fear is unfounded. As the Respondents acknowledged during oral argument, Oral Arg. Rec. at 1:11:47-1:12:25, 1:50:21-1:50:40, a party may petition the Commission under Section 19(c) to amend an SRO's fee rule through notice-and-comment rulemaking. 15 U.S.C. § 78s(c).[2] If the Commission denies the petition to amend, the party may petition our Court for review. *Id.* § 78y(a)(1); *Ass'n of Inv. Brokers v. S.E.C.*, 676 F.2d 857, 864 (D.C. Cir. 1982)

---

[2] The Commission also acknowledged at oral argument that it may informally seek additional information from exchanges before deciding whether to institute formal notice-and-comment rulemaking. Oral. Arg. Rec. at 1:25:10-1:35:10.

(explaining that our Court may "review agency action, including an agency's denial of a rulemaking petition" filed under 15 U.S.C. § 78s(c) (internal quotation marks omitted)); *WWHT, Inc. v. F.C.C.*, 656 F.2d 807, 809 (D.C. Cir. 1981) (holding that "an agency's denial of a rulemaking petition is subject to judicial review" unless "there is evidence of a clear and convincing legislative intent to negate review" (internal quotation marks omitted)).[3]   To be sure, we apply an "extremely deferential standard of review" to such petitions. *Timpinaro v. S.E.C.*, 2 F.3d 453, 461 (D.C. Cir. 1993) (internal quotation marks omitted).  But if Congress would prefer more rigorous judicial review of the Commission's refusal to review generally-applicable fee rules, it can amend the statute.

## III.

Accordingly, we grant the petitions for review, vacate the Commission's decision, and remand for proceedings consistent with this opinion.

*So ordered*.

---

[3] In addition, even though the Commission's decisions not to suspend fee rules within 60 days are not reviewable under 15 U.S.C. § 78s(b)(3)(C) and *NetCoalition II*, the Commission advised at oral argument that it now commonly does suspend fee rules.  Oral Arg. Rec. at 1:36:24-1:36:42 (stating that the agency suspends fee rules "with some frequency").  When it does so, the Commission must institute proceedings under 15 U.S.C. § 78s(b)(2)(B) to approve or disapprove the rule change.  *Id*. § 78s(b)(3)(C).   Once the Commission issues an order approving or disapproving the proposed fee rule, a person aggrieved by that final order could obtain judicial review under 15 U.S.C. § 78y(a).